**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

———————————————————————x

**MUHAMMAD RAHEEL QURESHI,**                    **Case No.**

　　　　**Plaintiff,**

　　- against -                                         **COMPLAINT**

**UNIVERSITY OF SOUTH FLORIDA BOARD**      *Jury Trial Demanded*
**OF TRUSTEES, and FLORIDA HEALTH**
**SCIENCES CENTER, INC., d/b/a TAMPA**
**GENERAL HOSPITAL,**

　　　　**Defendants.**

———————————————————————x

Plaintiff Muhammad Raheel Qureshi, M.D. ("Plaintiff" or "Dr. Qureshi"), by and through his undersigned counsel, Goddard Law PLLC, and files this Complaint against Defendant University of South Florida Board of Trustees ("Defendant USF" or "USF") and Defendant Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital ("Defendant TGH," "Tampa General," or "TGH") (collectively, "Defendants"), seeking recovery of damages and other appropriate relief for national origin and religious discrimination, a hostile work environment, retaliation, interference with rights under the Family and Medical Leave Act, breach of contract, and whistleblower retaliation, respectfully showing the Court as follows:

1.　　This is a civil action brought on behalf of Plaintiff Muhammad Raheel Qureshi, M.D., a physician of Pakistani national origin and Muslim faith, against Defendant University of South Florida Board of Trustees and Defendant Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital for national origin and religious

1

discrimination, a hostile work environment on the basis of national origin and religion, and retaliation for lawful complaints of discrimination and harassment, in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), as well as for interference with and retaliation for the exercise of rights protected by the Family and Medical Leave Act ("FMLA"); against Defendant TGH for national origin and religious discrimination and retaliation in violation of the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes ("FCRA"), and for breach of a Medical Directorship Agreement and retaliation in violation of the Florida Whistleblower Act, Fla. Stat. Section 448.102; against Defendant USF for breach of the Employment Agreement; and against Defendants USF and TGH for retaliation in violation of the False Claims Act, 31 U.S.C. Section 3730(h), together with any and all other causes of action which can be reasonably inferred from the facts set forth below.

## THE PARTIES

2.      Plaintiff is a male physician of Pakistani national origin and Muslim religion who at all times relevant to this action resided at 3551 Berry Briar Drive, Wesley Chapel, Florida 33543, and was employed by Defendant USF in the Morsani College of Medicine, Division of Pulmonary, Critical Care and Sleep Medicine, Department of Internal Medicine, as an Assistant Professor of Medicine.

3.      Plaintiff was, at all times relevant, Defendant USF's "employee" within the meaning of Title VII, the FCRA, the FMLA, and all other applicable laws.

4.      Defendant University of South Florida Board of Trustees is the governing body of the University of South Florida, a public research university, with its principal

2

place of business and Office of the General Counsel located at 4202 East Fowler Avenue, CGS301, Tampa, Florida 33620. USF was at all times relevant a covered employer under Title VII and the FMLA.

5.      Defendant USF was, at all times relevant, Plaintiff's "employer" within the meaning of Title VII, the FMLA, and all other applicable laws.

6.      Defendant Florida Health Sciences Center, Inc. d/b/a Tampa General Hospital is a nonprofit organization located at 1 Tampa General Circle, Tampa, Florida 33606. At all times relevant, TGH had over 15 employees within the meaning of Title VII and over 100 employees within the meaning of the FCRA. TGH was at all times relevant a covered employer under Title VII, the FCRA, the FMLA, and all other applicable statutes.

7.      At all times relevant, TGH was Plaintiff's employer within the meaning of all applicable laws. Plaintiff was jointly employed by USF and TGH. TGH supervised Plaintiff through its employee Dr. Kiran Dhanireddy, who served as Transplant Director and exercised supervisory authority over Dr. Qureshi's clinical assignments, professional advancement, and day-to-day working conditions. TGH also participated in the decision to offer Dr. Qureshi his faculty position, entered into a direct contractual relationship with him through a Medical Directorship Agreement, and jointly controlled the terms and conditions of his employment at the USF/Tampa General Hospital Center for Advanced Lung Disease ("CALD") and Lung Transplant Program.

8.      At all times relevant, Defendants were Plaintiff's "employers" within the meaning of Title VII, the FCRA, the FMLA, and other applicable laws.

3

9.     At all times relevant, Plaintiff was Defendants' "employee" within the meaning of Title VII, the FCRA, the FMLA, and other applicable laws.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Plaintiff's Title VII, FMLA, and False Claims Act claims pursuant to those statutes and the general federal question jurisdiction of this Court. This Court has supplemental jurisdiction over Plaintiff's FCRA claims, Florida Whistleblower Act claims, and breach of contract claim.

11.     Venue is proper in this judicial district pursuant to 28 U.S.C. Section 1391(b)(2), because a substantial part of the events and omissions giving rise to Plaintiff's claims, including the unlawful employment practices alleged herein, occurred in Tampa and Hillsborough County, Florida, within this district.

## PROCEDURAL REQUIREMENTS

12.     On or about July 18, 2025, Plaintiff filed a timely charge of discrimination with the Florida Commission on Human Relations and the U.S. Equal Employment Opportunity Commission ("EEOC"), bearing FCHR Charge No. 2026114504 and EEOC Charge No. 15D-2025-01261, alleging discrimination based on race, national origin, religion, and retaliation.

13.     On or about March 5, 2026, the EEOC issued Plaintiff a Determination and Notice of Rights. Plaintiff files this action within 90 days of receipt of the Notice of Rights. All conditions precedent to the filing of this action have been fulfilled.

## JURY DEMAND

14.     Plaintiff hereby demands a jury trial on all issues so triable.

4

## FACTUAL BACKGROUND

### USF and TGH Are Dr. Qureshi's Joint Employers

15.    As of January 2022, USF and TGH entered into an "enhanced alliance" intended to provide a unified management and support structure for physicians of both institutions. This enhanced alliance was in place throughout the entirety of Dr. Qureshi's tenure as a faculty member.

16.    Dr. Qureshi became an Assistant Professor of Medicine at USF in July 2022, after the enhanced alliance between USF and TGH had taken effect. For the entirety of his faculty tenure, he worked within the integrated USF/TGH structure at the jointly named and jointly operated Center for Advanced Lung Disease and Lung Transplant Program.

17.    Dr. Kiran Dhanireddy served as Transplant Director and is a TGH employee. Dr. Dhanireddy supervised Dr. Qureshi, threatened him with termination, made discriminatory remarks regarding his Pakistani national origin, and actively participated in the hostile and retaliatory conduct described herein, all while acting within the scope of his employment by TGH and exercising the joint supervisory authority over Dr. Qureshi that TGH shared with USF.

18.    TGH entered into a direct Medical Directorship Agreement with Dr. Qureshi, appointing him as Extracorporeal Membrane Oxygenation ("ECMO") Medical Director effective September 1, 2023, demonstrating TGH's independent contractual and administrative relationship with Dr. Qureshi.

19.    In or about January 2025, TGH leadership, jointly with USF, requested that Dr. Qureshi serve as Interim Director of the Lung Transplant Program and Center of

Advanced Lung Disease, demonstrating TGH's authority to assign and direct the duties of physicians working in the jointly-operated Center. The transition period was originally communicated to Dr. Qureshi as March 1 through April 30, 2025; however, USF and TGH unilaterally changed it to take immediate effect on January 1, 2025, without Dr. Qureshi's input or consent.

### Dr. Qureshi's Employment at USF

20.     Dr. Qureshi began his association with USF in 2018, serving as a fellow in pulmonary and critical care medicine at the Morsani College of Medicine. In July 2022, he became an Assistant Professor of Medicine in the Morsani College of Medicine, Division of Pulmonary, Critical Care and Sleep Medicine, Department of Internal Medicine, working in the USF/Tampa General Hospital Center for Advanced Lung Disease and Lung Transplant Program as a transplant pulmonologist.

21.     In June 2022, Defendant USF and Dr. Qureshi entered into an employment agreement, preceded by a Letter of Offer and a Clinical Term Sheet (collectively, the "Employment Agreement"). The Employment Agreement set forth the terms of Dr. Qureshi's compensation, full-time equivalent ("FTE") clinical allocation, administrative duties, and related obligations. Under the original Employment Agreement, Dr. Qureshi's clinical FTE was set at 95%, encompassing 228 clinical days per year, including 12 weeks of inpatient and 24/7 call coverage, 12 weeks of bronchoscopy and donor call, and 12 weeks of outpatient lung transplant clinics. The Employment Agreement provided that clinical assignments exceeding 228 days would be compensated at a rate of $150 per hour, up to a maximum annual compensation of $650,000.

22.    During his tenure at USF, Dr. Qureshi was a dedicated and accomplished physician. He served the Lung Transplant Program through high-complexity inpatient and outpatient clinical duties and demonstrated consistent commitment to patient care, program development, and institutional responsibilities. His performance evaluations rated him as meeting high standards, and he was recognized on regional and national "Best Doctors" lists, including as a Castle Connolly Top Doctor in 2023, 2024, and 2025, and as a Tampa Bay Top Doctor in 2024 and 2025. Under his leadership, the ECMO program at TGH earned the Gold Level ELSO Award for Excellence in Life Support. Under his clinical leadership, TGH successfully performed its first liver-lung transplant in 2025 and four heart-lung transplants in 2023 and 2024.

23.    The Employment Agreement was subsequently amended by the 2023 and 2024 Faculty Assignment and Evaluation forms to reflect Dr. Qureshi's assumption of additional administrative roles and the corresponding reduction of his clinical FTE. At the peak of his institutional responsibilities, from January 2025 through April 3, 2025, Dr. Qureshi simultaneously held four distinct roles: Assistant Professor of Medicine and full-time faculty member in the Lung Transplant Program; Associate Program Director of the USF Pulmonary and Critical Care Medicine Fellowship Program; ECMO Medical Director at Tampa General Hospital; and Interim Director of the Lung Transplant Program and Center of Advanced Lung Disease.

**Defendants Discriminate Against Dr. Qureshi Based on National Origin and Religion**

24.     Throughout his employment at USF, Dr. Qureshi was subjected to discriminatory treatment and remarks on account of his Pakistani national origin and his Muslim religion.

25.     Specifically, on at least one occasion in or about January 2024, Dr. Jose Herazo-Maya ("Dr. Herazo" or "Dr. Herazo-Maya"), Chief of the Division of Pulmonary, Critical Care and Sleep Medicine and Dr. Qureshi's direct supervisor, made a discriminatory remark regarding Dr. Qureshi's national origin, stating: "He is from Pakistan and needs to adapt to the norms of this organization." Transplant leadership, including Dr. Herazo-Maya and Dr. Kiran Dhanireddy, made additional discriminatory statements about Dr. Qureshi based on his Pakistani national origin. Dr. Herazo-Maya made public statements to faculty members regarding Dr. Qureshi, including: "This is not Pakistan and he should lay low and keep his head down" and "Raheel is from Pakistan, he will learn to keep his head down." Dr. Dhanireddy questioned Dr. Qureshi's competence and delayed his professional advancement because Dr. Qureshi was "from a developing nation."

26.     Over the course of approximately four years, and continuing through the end of his employment in February 2026, Dr. Qureshi was habitually assigned to clinical duties during all major Muslim religious holidays. Dr. Dhanireddy also refused to allow Dr. Qureshi time off to observe important Muslim religious holidays when requested. Dr. Qureshi was not afforded the same consideration given to colleagues of other faiths or national origins with respect to holiday scheduling. In contrast, Dr. Kapil Patel, a physician of Indian national origin and a colleague in the same program, was permitted to exercise

substantially greater scheduling flexibility, including taking leave without prior authorization or approval requirements — a disparity that Dr. Dhanireddy and Dr. Herazo-Maya, despite their supervisory roles, knowingly tolerated.

### Dr. Qureshi Assumes Additional Administrative Roles

27. On or about July 23, 2023, Dr. Qureshi became Associate Program Director of the USF Pulmonary and Critical Care Medicine Fellowship Program, formally reducing his clinical FTE allocation. At that time, Dr. Qureshi simultaneously held the titles of Assistant Professor of Medicine and full-time faculty member in the Lung Transplant Program, and Associate Program Director of the USF Pulmonary and Critical Care Medicine Fellowship Program.

28. On or about September 1, 2023, Dr. Qureshi was appointed ECMO Medical Director at Tampa General Hospital pursuant to the Medical Directorship Agreement. With this appointment, Dr. Qureshi simultaneously held three distinct institutional titles: Assistant Professor of Medicine and full-time faculty member in the Lung Transplant Program, Associate Program Director of the USF Pulmonary and Critical Care Medicine Fellowship Program, and ECMO Medical Director at Tampa General Hospital.

29. As a result of Dr. Qureshi's assumption of the Associate Program Director and ECMO Medical Director roles, his clinical FTE allocation was reduced by approximately forty-four percent, with forty percent of his effort designated for service, administration, and leadership. In practical terms, this reduction limited Dr. Qureshi's contractual clinical obligation to approximately 103 days per year.

### Dr. Qureshi Files an EthicsPoint Complaint and USF Retaliates

30.     Dr. Qureshi's experience at USF deteriorated significantly beginning in December 2023, after he raised a number of legitimate concerns regarding both quality of care and regulatory issues with the then-Medical Director, Kapil Patel, M.D., who had been demoted as Director of the Center for Advanced Lung Disease in December 2023 due to professional and regulatory misconduct. Rather than receiving a collegial or constructive response, Dr. Qureshi was met with escalating hostility and retaliatory behavior.

31.     On or about January 15, 2024, Dr. Qureshi filed a formal complaint through USF's EthicsPoint reporting system raising concerns about quality of care, regulatory compliance, national origin and religious discrimination, and the hostile environment within the lung transplant team, including obligations arising under applicable Centers for Medicare and Medicaid Services ("CMS") Conditions of Participation and organ procurement and transplantation network reporting requirements governing a program that bills and receives reimbursement from federal healthcare programs. The complaint named Transplant Director Kiran Dhanireddy, M.D., Chief of Pulmonary and Critical Care Jose Herazo, M.D., and Interim Chair of Medicine Harry Van Loveren, M.D., and detailed how transplant leadership had suppressed Dr. Qureshi's concerns about Dr. Patel's conduct and retaliated against him for raising them.

32.     USF did not acknowledge or respond to Dr. Qureshi's January 2024 EthicsPoint complaint. In or about March 2024, when no acknowledgment or response had been received, Dr. Qureshi resubmitted his complaint through the EthicsPoint portal, this time identifying himself as the reporting party.

33.    Rather than investigate or address Dr. Qureshi's complaints, USF and TGH leadership responded with a coordinated pattern of retaliatory conduct. Beginning in or about early 2024, Dr. Herazo, acting in his capacity as Chief of the Division of Pulmonary, Critical Care and Sleep Medicine and exercising authority over Dr. Qureshi's participation in institutional governance bodies, removed Dr. Qureshi from the Lung Executive Council in retaliation for his protected complaints. USF also rescheduled Medical Review Board meetings at times that prevented Dr. Qureshi from attending, thereby eliminating his ability to raise patient care and compliance concerns through that institutional channel.

34.    On or about April 8, 2024, Dr. Qureshi made additional written reports to USF leadership regarding retaliatory conduct he was experiencing in direct response to his protected complaints, including his removal from the Lung Executive Council, the rescheduling of Medical Review Board meetings, and efforts to undermine his clinical trial responsibilities.

35.    On or about June 12, 2024, USF convened a department meeting entitled "Role, Responsibilities, and Escalation in Lung Transplant." At the meeting, USF leadership announced that executive leadership was fully supportive of Dr. Patel and his management of the program, that all concerns about Dr. Patel were required to be directed to Dr. Patel himself, and that Dr. Herazo would no longer hold meetings to address team concerns. Leadership also presented a "Roles & Responsibilities" document drafted unilaterally by Dr. Patel that disregarded revisions previously agreed upon by the team.

11

36.    On or about June 19, 2024, Dr. Qureshi emailed Interim Chair Dr. Harry Van Loveren regarding Dr. Herazo's efforts to silence complaints and concerns within the division. No response was received.

37.    In two separate meetings witnessed by other faculty members, USF leadership expressly acknowledged the hostile environment within the transplant program and affirmed the legitimacy of Dr. Qureshi's concerns. Despite these acknowledgments, leadership took no remedial action. Instead, Dr. Herazo, Dr. Dhanireddy, and Dr. Van Loveren explicitly threatened Dr. Qureshi with termination if he continued to advocate for accountability within the transplant program.

38.    On or about December 3, 2024, an organizational representative posted through the EthicsPoint portal that USF was "considering the possibility of closing this report as the individual you identified as the primary cause of your concern is departing," and invited Dr. Qureshi to provide any additional matters by December 13, 2024, before recommending closure. On or about December 11, 2024, Dr. Qureshi objected through the EthicsPoint portal, expressly stating that he did not agree with closing the matter and that the underlying conduct — including the hostile work environment and deliberate interference with the operations of the transplant program — had not been resolved by Dr. Patel's departure. Despite this express objection, on or about December 30, 2024, USF unilaterally and administratively closed the complaint without conducting any investigation, without communicating any investigative finding to Dr. Qureshi, and without implementing any remedial action.

12

39.     In or about January 2025, at the request of USF and TGH leadership, Dr. Qureshi agreed to serve as Interim Director for the Lung Transplant Program and Center of Advanced Lung Disease, with less than twenty-four hours' notice. In accepting this additional responsibility, Dr. Qureshi also took on the clinical responsibilities previously handled by the departing Director, all while simultaneously fulfilling his existing roles as Associate Program Director of the USF Pulmonary and Critical Care Medicine Fellowship Program, ECMO Medical Director at Tampa General Hospital, and a full-time faculty member in the Lung Transplant Program with ongoing clinical, research, and teaching obligations.

### The April 2025 Events and Dr. Qureshi's Hospitalization

40.     On the evening of April 3, 2025, at approximately 8:37 p.m., Dr. Qureshi sent a group text message to Dr. Herazo and Dr. Ishna Poojary-Hohman ("Dr. Poojary-Hohman"), a transplant pulmonology colleague, raising patient safety concerns and informing them of his intention to resign from his role as Interim Director of the Lung Transplant Program. Dr. Herazo responded to Dr. Qureshi's substantive message with only a single "thumbs up" emoji. Dr. Qureshi's resignation from the Interim Director role was not voluntary in the ordinary sense: it was the direct product of the intolerable hostile and retaliatory conditions that Defendants had created and permitted to persist. His resignation from the Interim Director role meant he still held three institutional titles: Associate Program Director of the USF Pulmonary and Critical Care Medicine Fellowship Program, ECMO Medical Director at Tampa General Hospital, and Assistant Professor of Medicine and full-time faculty member in the Lung Transplant Program.

13

41.     On April 4, 2025, Dr. Qureshi performed all of his scheduled clinical duties, including rounds, triage, donor calls, and afternoon on-site rounds, and properly signed out patient care to Dr. Poojary-Hohman and a certified advanced practice provider at the conclusion of his shift.

42.     Over the weekend of April 5–6, 2025, USF threatened Dr. Qureshi with termination and formally reprimanded him for allegedly violating a policy regarding campus presence. The stated basis for this reprimand was that Dr. Qureshi had not reported to the hospital as expected on two separate occasions during the weeks of March 31, 2025 and April 7, 2025. This stated reason was pretextual. Dr. Qureshi was in fact present and on service during the week of March 31, 2025 — one of the two cited occasions — having fully reported for duty and completed all assigned clinical obligations without deficiency or lapse in patient care. On the other occasion, he was not scheduled to be present because he had a pre-arranged and approved absence to prepare for and lead the nationally recognized ECMO Symposium scheduled for April 8, 2025, an arrangement that had been communicated to and acknowledged by USF and TGH leadership weeks in advance. The reprimand was issued immediately after Dr. Qureshi's April 3, 2025 patient safety complaints and resignation from the Interim Director role. On April 6, 2025, Dr. Qureshi sent a detailed email to USF executive leadership addressing his decision to resign from his interim director role and reflecting on the ongoing professional and ethical circumstances he had witnessed.

43.     On April 7, 2025, at approximately 8:30 a.m., USF management, including Dr. Mark Moseley, Chair of Internal Medicine, and Dr. Herazo, Division Chief, convened

14

a compulsory in-person meeting with Dr. Qureshi. This meeting fell on Dr. Qureshi's first day off after twelve consecutive days of around-the-clock inpatient and donor call service. At the meeting, Dr. Qureshi was falsely accused of having abandoned his clinical responsibilities and of failing to report to work as scheduled. These accusations were false: Dr. Qureshi's documented schedule and clinical sign-outs confirmed that he had fulfilled all assigned clinical duties and properly transitioned patient care at the conclusion of his shift. Dr. Qureshi was further accused of improperly attempting to resign from the Interim Director role. Later that same day, Dr. Qureshi was called into a second compulsory meeting, where Dr. Dhanireddy and Dr. Herazo falsely accused him of communication lapses and failures in transplant schedule coverage, and again threatened termination through indirect threats and an ultimatum. Prior to the events of April 7, 2025, Dr. Qureshi had never been subjected to any formal written admonishment, disciplinary action, or documented performance-related corrective measures during his three-year tenure with USF and TGH, aside from isolated indirect threats of termination made by Drs. Dhanireddy and Herazo in mid-2024. Following the April 7, 2025 meeting, Dr. Qureshi suffered an acute medical episode requiring emergency hospitalization at BayCare Hospital at Wesley Chapel.

44.     On April 8, 2025, Dr. Qureshi notified Dr. Herazo of his hospitalization by text message, stating: "Please excuse the delay in communication. I have been in the hospital since late yesterday afternoon and, understandably, was unable to attend the symposium today. It appears unlikely that I will be able to join tomorrow as well." Dr.

15

Herazo acknowledged receipt of the message, responding: "Thanks for keeping me in the loop. I will let Christian know that you are out on sick leave. I hope you feel better."

45.    Also on April 8, 2025, while Dr. Qureshi was still hospitalized, USF sent sheriff's deputies to his home for a purported "wellness check," without first contacting his wife, who is his designated emergency contact. Mrs. Qureshi spoke with the deputies through her doorbell camera while at the hospital with her husband and explained that Dr. Qureshi was hospitalized. The dispatch of law enforcement to Dr. Qureshi's home without first contacting his emergency contact, while he was known to be hospitalized, compounded the stress and distress being experienced by Dr. Qureshi's family and embarrassed him in front of his neighbors.

46.    On April 10, 2025, USF sent Dr. Qureshi a formal written admonition falsely accusing him of failing to report to work as expected on two separate occasions during the weeks of March 31, 2025 and April 7, 2025, and of abandoning his clinical responsibilities and patients. As set forth above, these accusations were entirely false. USF issued this written admonition despite prior notification of Dr. Qureshi's medical circumstances, request for medical leave/FMLA, and related communications through text messages and emails preceding the disciplinary action.

### USF Interferes with Dr. Qureshi's FMLA Rights

47.    On April 9, 2025, upon returning home from the hospital, Dr. Qureshi formally submitted a request for medical leave through USF's Oracle HR portal.

48.    On April 10, 2025, rather than processing Dr. Qureshi's timely leave request, USF sent a letter from Javier Cuevas, PhD, Senior Associate Vice President of Academic

16

Affairs, USF Health, and Olga Joanow, Associate Vice President for Faculty Relations, placing Dr. Qureshi on compulsory leave and conditioning his return to work upon a fitness-for-duty evaluation by a psychologist, Dr. Gary Wood. USF issued this letter despite having received direct notification from Dr. Herazo on April 8, 2025, that Dr. Qureshi had been hospitalized for cardiac symptoms. The compulsory leave letter was issued the same day that Dr. Qureshi sent a formal medical leave communication to Dr. Herazo.

49.     USF's decision to require a psychological fitness-for-duty evaluation, rather than a cardiac or general medical evaluation, while it was aware Dr. Qureshi had been hospitalized for cardiac symptoms, was an act of retaliation designed to discredit Dr. Qureshi and imply that his protected complaints were the product of mental illness rather than legitimate professional concerns. The compulsory leave letter framed the evaluation as ensuring that Dr. Qureshi would be in "an appropriate frame of mind to engage with patients" and that he would receive "support for any issues" he "may be dealing with" — language that bears no relationship to a cardiac hospitalization and was patently designed to stigmatize his protected activity.

50.     Dr. Qureshi's initial Oracle submission on April 9, 2025 at 5:48 p.m. included his BayCare discharge summary as supporting documentation. USF's Leave Consultant, Juanita Lyerly, rejected this submission on April 14, 2025 — five days later — without any prior outreach, request for clarification, or communication identifying what documentation was deficient. No guidance or communication was provided for the following 23 days. On May 7, 2025, Dr. Qureshi submitted additional documentation,

including his BayCare discharge summary, his internist's letter, upcoming cardiology appointment records, and a formal written medical leave request. On May 23, 2025, Ms. Lyerly rejected that submission as well, citing a documentation deadline of May 6, 2025 — a deadline that had already expired seventeen days before the rejection notice was issued and had never been communicated to Dr. Qureshi before it passed.

51.     In early June 2025, USF stopped paying Dr. Qureshi's wages while he remained on medical leave, despite the fact that he had approximately six hundred hours of accrued paid sick leave and annual leave available — including a pre-approved annual leave period from May 15 through June 30, 2025, which had been approved prior to the events of April 2025. USF simultaneously required him to pay the employee portion of his health insurance premiums out of pocket. USF applied and removed sick leave designations without notice or adequate communication.

52.     FMLA leave was not formally approved until on or about June 18, 2025, despite Dr. Qureshi having submitted his initial leave request through the Oracle portal on April 9, 2025, approximately ten weeks earlier. The FMLA team did not make first contact with Dr. Qureshi regarding his leave request until on or about May 28, 2025 — nearly seven weeks after his initial submission.

**TGH Fails to Pay Compensation Owed Under the Medical Directorship Agreement**

53.     As set forth above, Defendant TGH and Dr. Qureshi had entered into an enforceable Medical Directorship Agreement appointing Dr. Qureshi as ECMO Medical Director at Tampa General Hospital effective September 1, 2023. This agreement was

18

separate and distinct from, and independent of, the Employment Agreement between Dr. Qureshi and Defendant USF.

54.     Under the Medical Directorship Agreement, Defendant TGH was obligated to pay Dr. Qureshi compensation for his services as ECMO Medical Director beginning September 1, 2023. In or about March 2025, Physician Contract Manager Lisa Chadwick confirmed in writing, in a communication circulated internally to finance personnel at both TGH and USF, that a retroactive lump-sum payment was owed to Dr. Qureshi for those services, in addition to ongoing monthly compensation at a rate of $201 per hour going forward.

55.     Dr. Qureshi performed all of his obligations as ECMO Medical Director under the Medical Directorship Agreement throughout the relevant period. He was not informed that timesheets were required for payment until March 2025, more than eighteen months after services began. Upon receiving this information, he submitted the required timesheets promptly thereafter.

56.     Despite the Medical Directorship Agreement being fully executed, despite TGH's internal confirmation of the amount owed, and despite Dr. Qureshi's timely submission of required timesheets, Defendant TGH failed to pay any of the compensation owed to Dr. Qureshi as ECMO Medical Director.

**USF Breaches the Employment Agreement**

57.     The Employment Agreement obligated Defendant USF to honor Dr. Qureshi's reduced clinical FTE allocation following his assumption of the Associate Program Director and ECMO Medical Director roles, to pay him for extra CALD clinical shifts at his agreed rate, to

reimburse his professional licensing fees and expenses, and to otherwise comply with the terms of the Employment Agreement.

58.    As Dr. Qureshi transitioned into the Associate Program Director role in June 2023 and the ECMO Medical Director role in September 2023, his clinical obligations were formally reduced from 95% of his time to 44%, limiting his contractual clinical obligation to approximately 103 days per year. Despite this obligation, USF never made any meaningful effort to reduce his clinical burden. In the first quarter of 2025 alone — January 1 through April 4, 2025 — Dr. Qureshi worked 17 outpatient clinical days and 47 inpatient clinical days, totaling 64 clinical days, plus 45 donor call days.

59.    Dr. Qureshi worked 31 extra CALD clinical shifts during the period of January 1 through April 4, 2025 at the agreed rate. These shifts were submitted for payment first in April 2025, and again in May 29, 2025 after they were not initially paid. The 31 extra shifts comprised 7 inpatient extra shifts in January 2025, 10 in February 2025, 10 in March 2025, and 4 in April 2025. On July 3, 2025, Dr. Qureshi sent a follow-up reminder to USF and TGH administrative personnel, attaching the same documentation and requesting confirmation of receipt and a status update. No response was received. Despite USF's established practice of paying extra shift compensation within one to two weeks, USF made only a partial payment on August 15, 2025, and no other payment has been made as of the date of this filing.

60.    On February 22, 2026, USF's Division Administrator, Christian Johnson, emailed Dr. Qureshi advising him that he had a remaining CME balance of $1,190 and inviting him to submit any expenses for reimbursement by February 28, 2026. On February 24, 2026, Dr. Qureshi submitted conference registration expenses for the ISHLT and ATS annual meetings. That same evening, Ms. Johnson denied the submission, stating that the expenses did not meet existing

20

guidelines because the conferences would occur after Dr. Qureshi's last day of employment. This denial directly contradicted the division's own written FY26 CME and Travel Policy, circulated by Office Manager Clare McGrane on October 30, 2025, which explicitly stated that "conference registration fees will now be paid using your CME allowance" and identified conference travel registration fees as a covered CME expense. On February 27, 2026, Dr. Qureshi formally objected, noting that his submissions were made in direct reliance on that written guidance. Ms. Johnson denied the submission again on the same date, this time citing Dr. Qureshi's employment status at the time of conference travel. As of the date of this filing, USF has refused to reimburse $1,190 in CME expenses that its own written policy identified as reimbursable and that USF itself invited Dr. Qureshi to submit.

## Defendants Constructively Discharge Dr. Qureshi

61. The cumulative effect of Defendants' sustained discriminatory conduct, hostile work environment, retaliation for protected activity, USF's interference with Dr. Qureshi's FMLA rights, continued nonpayment of compensation, and the conditions imposed on any potential return to work rendered Dr. Qureshi's continued employment intolerable and impossible. Upon and following his return from protected medical leave in September 2025, Dr. Qureshi was subjected to additional adverse employment actions, including removal from and vacating of his office space, reassignment and alteration of his professional responsibilities, and escalation of clinical duties beyond the scope of his prior contractual obligations and established practice patterns. These measures collectively reflected a coordinated effort to marginalize his professional role, undermine his standing within the institution, and impose conditions conducive to constructive separation..

21

62.     Dr. Qureshi's resignation became effective on February 28, 2026, constituting a constructive discharge attributable to Defendants' ongoing and escalating discrimination, retaliation, and contractual breaches.

## CLAIMS FOR RELIEF

## COUNT I
*(National Origin Discrimination in Violation of Title VII - Against Defendants USF and TGH)*

63.     Plaintiff incorporates by reference paragraphs 15 through 23, 24 through 27, 28 through 32, and 61 through 62 of this Complaint.

64.     As set forth above, Plaintiff was subjected to discrimination by Defendants USF and TGH on account of his Pakistani national origin. Defendant TGH is liable for the discriminatory conduct alleged herein both as a joint employer of Dr. Qureshi and because its employee, Dr. Kiran Dhanireddy, who served as Transplant Director and exercised direct supervisory authority over Dr. Qureshi, was a primary actor in the discriminatory conduct, including questioning Dr. Qureshi's competence and delaying his professional advancement because he was "from a developing nation." Dr. Herazo, Dr. Qureshi's direct supervisor and Chief of the Division of Pulmonary, Critical Care and Sleep Medicine, made discriminatory remarks expressly referencing Dr. Qureshi's national origin, including stating, "He is from Pakistan and needs to adapt to the norms of this organization," "This is not Pakistan and he should lay low and keep his head down," and "Raheel is from Pakistan, he will learn to keep his head down."

22

65.     Plaintiff was further subjected to discriminatory treatment in the terms and conditions of his employment, including workload assignments and the hostile, retaliatory conduct described above, because of his national origin.

66.     Similarly situated employees who did not share Plaintiff's Pakistani national origin were treated more favorably than Plaintiff.

67.     The conduct of Defendants was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff. Punitive damages are sought against Defendant TGH (a private entity) in an amount to be determined at trial.

68.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

## COUNT II
*(Religious Discrimination in Violation of Title VII - Against Defendants USF and TGH)*

69.     Plaintiff incorporates by reference paragraphs 15 through 23, 24 through 27, 28 through 32, and 61 through 62 of this Complaint.

70.     As set forth above, Plaintiff was subjected to discrimination by Defendants USF and TGH on account of his Muslim religion. Defendant TGH is liable for the discriminatory conduct alleged herein both as a joint employer of Dr. Qureshi and because its employee, Dr. Dhanireddy, refused to allow Dr. Qureshi time off to observe important Muslim religious holidays and exercised supervisory authority to perpetuate discriminatory scheduling conditions. Over the course of approximately four years, and continuing through the end of his employment in February 2026, Defendants repeatedly assigned Plaintiff to clinical duties during major Muslim religious holidays, denying him the

23

accommodations provided to colleagues of other faiths and subjecting him to unequal terms and conditions of employment because of his religion.

71.     Similarly situated employees who did not share Plaintiff's religious faith were treated more favorably than Plaintiff with respect to scheduling and holiday accommodations.

72.     The conduct of Defendants was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff. Punitive damages are sought against Defendant TGH (a private entity) in an amount to be determined at trial.

73.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

## COUNT III
*(Hostile Work Environment Based on National Origin and Religion in Violation of Title VII - Against Defendants USF and TGH)*

74.     Plaintiff incorporates by reference paragraphs 15 through 23, 24 through 27, 28 through 32, 33 through 38, and 39 through 48 of this Complaint.

75.     As set forth above, Plaintiff was subjected to a hostile work environment by Defendants USF and TGH on account of his Pakistani national origin and Muslim religion. Defendant TGH is liable for the hostile work environment alleged herein both as a joint employer of Dr. Qureshi and because the hostile conduct occurred within the jointly-operated Center for Advanced Lung Disease and Lung Transplant Program and was perpetuated in significant part by TGH's employee Dr. Dhanireddy. The hostile environment was pervasive and severe, including discriminatory remarks by supervisory personnel about Dr. Qureshi's national origin, repeated discriminatory holiday scheduling,

24

the escalation of retaliatory and hostile administrative actions following his protected complaints, and a compulsory hostile meeting that contributed to Dr. Qureshi's hospitalization for acute cardiac symptoms.

76.    Supervisory personnel of Defendants, including Dr. Herazo and Dr. Dhanireddy, made discriminatory remarks about Plaintiff's national origin and engaged in a sustained pattern of conduct designed to undermine his professional standing, exclude him from key decision-making processes, and discredit his legitimate concerns.

77.    The hostile work environment substantially interfered with the terms and conditions of Plaintiff's employment and with his ability to perform his duties.

78.    Defendants knew or should have known of the hostile work environment and failed to take prompt or remedial corrective action.

79.    By reason of Defendants' creation and maintenance of a hostile work environment, Plaintiff is entitled to all remedies available for violations of Title VII.

**COUNT IV**
*(Retaliation for Protected Activity in Violation of Title VII - Against Defendants USF and TGH)*

80.    Plaintiff incorporates by reference paragraphs 33 through 38, 39 through 48, 49 through 53, and 61 through 62 of this Complaint.

81.    In retaliation for Plaintiff's protected activity opposing discrimination on the basis of national origin and religion, Defendants subjected Plaintiff to the adverse actions set forth in the incorporated paragraphs above. This retaliation substantially interfered with Plaintiff's employment and altered the terms and conditions of his employment, ultimately resulting in his constructive discharge on February 28, 2026.

25

82. The conduct of Defendants was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff. Punitive damages are sought against Defendant TGH (a private entity) in an amount to be determined at trial.

83. By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of Title VII.

## COUNT V
*(National Origin and Religious Discrimination in Violation of the Florida Civil Rights Act, Chapter 760, Florida Statutes - Against Defendant TGH)*

84. Plaintiff incorporates by reference paragraphs 15 through 23, 24 through 27, 28 through 32, and 61 through 62 of this Complaint.

85. Defendant TGH knowingly and willfully discriminated against Plaintiff on the basis of his Pakistani national origin and Muslim religion in violation of the Florida Civil Rights Act of 1992, Chapter 760, Florida Statutes. Defendant TGH is liable as a joint employer of Dr. Qureshi, through whose integrated workplace structure and through whose employee Dr. Dhanireddy the discriminatory conduct was perpetuated.

86. Defendant TGH discriminated against Plaintiff by treating him differently from, and less favorably than, similarly situated employees who did not share his national origin or religion, and by subjecting him to a hostile work environment on account of his national origin and religion, as set forth above.

87. Defendant TGH's violation of the FCRA was the natural and proximate cause of damages to Plaintiff.

88.    The conduct of Defendant TGH was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

89.    By reason of Defendant TGH's discrimination, Plaintiff is entitled to all remedies available for violations of the FCRA.

## COUNT VI
*(Retaliation in Violation of the Florida Civil Rights Act, Chapter 760, Florida Statutes - Against Defendant TGH)*

90.    Plaintiff incorporates by reference paragraphs 15 through 19, 33 through 53, and 61 through 62 of this Complaint.

91.    Plaintiff repeatedly complained to Defendants about the ongoing national origin and religious discrimination he was experiencing, constituting protected activity under Chapter 760, Florida Statutes. Defendant TGH is liable for the retaliation alleged herein both as a joint employer of Dr. Qureshi and because its employee, Dr. Dhanireddy, directly participated in the retaliatory actions described herein, including threatening termination and participating in the hostile April 7, 2025 confrontation.

92.    In retaliation for Plaintiff's protected activity, Defendant TGH, acting through its employee Dr. Dhanireddy and jointly with USF through the integrated Center, subjected Plaintiff to the adverse actions described above, including participation in the hostile compulsory meeting, threats of termination, dispatch of law enforcement to his home during his hospitalization, issuance of a written admonishment while he was hospitalized, compulsory leave overriding his FMLA request, and the sustained campaign of adverse actions that culminated in Dr. Qureshi's constructive discharge.

93.　The retaliatory conduct substantially interfered with the terms and conditions of Plaintiff's employment and ultimately resulted in Plaintiff's constructive discharge on February 28, 2026.

94.　The conduct of Defendant TGH was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

95.　By reason of Defendant TGH's retaliation, Plaintiff is entitled to all remedies available for violations of the FCRA.

## COUNT VII
*(Interference with FMLA Rights - Against Defendants USF and TGH)*

96.　Plaintiff incorporates by reference paragraphs 39 through 48, and 49 through 53 of this Complaint.

97.　Plaintiff was an eligible employee entitled to leave under the Family and Medical Leave Act. On April 9, 2025, Dr. Qureshi submitted a request for medical leave through USF's Oracle HR portal. Dr. Qureshi's submission was supported by documented medical evidence of his cardiac hospitalization.

98.　Rather than processing Plaintiff's timely FMLA request, Defendant USF overrode the request and placed Plaintiff on compulsory leave conditioned on a psychiatric fitness-for-duty evaluation, despite knowing that Plaintiff had been hospitalized for a cardiac event and discharged on cardiac medications.

99.　Defendant USF further interfered with Plaintiff's FMLA rights by stopping his wages in early June 2025 while he remained on leave and had approximately five

hundred hours of accrued sick and annual leave available, and by requiring him to pay his employee health insurance premiums out of pocket during this period.

100. Defendant TGH, as a joint employer of Dr. Qureshi, also had obligations under the FMLA and participated in the interference with Dr. Qureshi's FMLA rights. TGH's employee Dr. Dhanireddy jointly controlled the scheduling decisions and hostile working conditions that directly precipitated Dr. Qureshi's hospitalization and need for FMLA leave.

101. FMLA leave was not formally approved until on or about June 18, 2025, approximately ten weeks after Plaintiff submitted his initial leave request on April 9, 2025. Defendants' delay in processing Plaintiff's leave request and the conditions placed on his return to work constituted interference with Plaintiff's FMLA rights.

102. By reason of Defendants' interference with his FMLA rights, Plaintiff suffered harm including lost wages, lost benefits, emotional distress, and other damages, and is entitled to all remedies available under the FMLA.

## COUNT VIII
*(Retaliation in Violation of the FMLA - Against Defendants USF and TGH)*

103. Plaintiff incorporates by reference paragraphs 33 through 38, 39 through 48, 49 through 53, and 61 through 62 of this Complaint.

104. Plaintiff engaged in activity protected by the FMLA when he submitted his request for medical leave on April 9, 2025, following his hospitalization for acute cardiac symptoms.

29

105.    In retaliation for Plaintiff's exercise of his FMLA rights, Defendants subjected Plaintiff to a series of adverse actions, including: overriding his FMLA request and placing him on compulsory psychiatric leave; stopping his wages in early June 2025 while he remained on leave and had substantial accrued leave available; threatening his benefits and requiring him to pay employee health insurance premiums out of pocket; and manipulating his leave records without notice.

106.    The temporal proximity between Plaintiff's exercise of FMLA rights and Defendants' adverse actions is evidence of retaliatory intent.

107.    The retaliation substantially interfered with Plaintiff's employment, caused him significant financial harm, and contributed to the conditions that resulted in his constructive discharge on February 28, 2026.

108.    By reason of Defendants' retaliation, Plaintiff suffered harm and is entitled to all remedies available under the FMLA.

### COUNT IX
*(Breach of Medical Directorship Agreement - Against Defendant TGH Only)*

109.    Plaintiff incorporates by reference paragraphs 15 through 19 and 53 through 56 of this Complaint.

110.    Defendant TGH and Dr. Qureshi entered into an enforceable Medical Directorship Agreement appointing Dr. Qureshi as ECMO Medical Director at Tampa General Hospital effective September 1, 2023. This agreement is separate and distinct from, and independent of, the Employment Agreement between Dr. Qureshi and Defendant USF.

111. Under the Medical Directorship Agreement, Defendant TGH was obligated to pay Dr. Qureshi compensation for his services as ECMO Medical Director beginning September 1, 2023. TGH's own Physician Contract Manager, Lisa Chadwick, confirmed in writing, in a communication circulated internally to finance personnel at both TGH and USF, that a retroactive lump-sum payment of hundreds of thousands of dollars was owed to Dr. Qureshi for services rendered from September 1, 2023 through February 28, 2025, in addition to ongoing monthly compensation at an agreed rate.

112. Dr. Qureshi performed all of his obligations as ECMO Medical Director under the Medical Directorship Agreement throughout the relevant period. Dr. Qureshi was not informed that timesheets were required for payment until March 2025, more than eighteen months after services began. Upon receiving this information, he submitted the required timesheets promptly thereafter.

113. Defendant TGH materially breached the Medical Directorship Agreement by failing to pay Dr. Qureshi the compensation that its own Physician Contract Manager confirmed was owed for the period of September 1, 2023 through February 28, 2025, and by failing to pay ongoing monthly compensation thereafter, despite the agreement being fully executed and despite Dr. Qureshi's submission of the required timesheets. As of the date of this filing, no payment whatsoever has been made.

114. As a direct and proximate result of Defendant TGH's material breach of the Medical Directorship Agreement, Plaintiff suffered damages in an amount to be determined at trial, plus pre- and post-judgment interest and all other relief to which he is entitled.

## COUNT X

*(Breach of Employment Agreement - Against Defendant USF Only)*

115.    Plaintiff incorporates by reference paragraphs 20 through 23, 27 through 29, and 58 through 61 of this Complaint.

116.    On June 6, 2022, Dr. Qureshi and Defendant USF entered into an enforceable employment agreement, preceded by a Letter of Offer dated May 31, 2022, and a Clinical Term Sheet, subsequently amended by the 2023 and 2024 Faculty Assignment and Evaluation forms (collectively, the "Employment Agreement"). The Employment Agreement set forth the terms of Dr. Qureshi's compensation, clinical FTE allocation, administrative duties, and related obligations.

117.    The Employment Agreement obligated Defendant USF to: (a) honor Dr. Qureshi's reduced clinical FTE allocation following his formal assumption of additional administrative roles in June and September 2023; (b) pay Dr. Qureshi for extra Center for Advanced Lung Disease clinical shifts at the agreed contractual rate; (c) compensate Dr. Qureshi for donor call obligations consistent with the terms of the Employment Agreement; and (d) reimburse Dr. Qureshi for professional licensing fees and expenses.

118.    Defendant USF materially breached the Employment Agreement by failing to honor Dr. Qureshi's reduced clinical FTE allocation. Despite his formally reduced clinical obligation, USF imposed clinical and donor call workload demands in the first quarter of 2025 — January 1 through April 4, 2025 — that substantially exceeded his entire reduced annual contractual allocation, without providing adequate coverage, relief, or support.

119.    Defendant USF materially breached the Employment Agreement by failing to pay Dr. Qureshi for extra Center for Advanced Lung Disease clinical shifts worked during the period of January through April 2025 at the agreed contractual rate, despite Dr. Qureshi's timely

submission of the relevant timesheets and despite USF's established practice of compensating extra shifts promptly upon submission.

120.    Defendant USF materially breached the Employment Agreement by failing to compensate Dr. Qureshi for donor call services performed outside his reduced contractual FTE allocation for the period of September 2023 through the commencement of his medical leave on April 7, 2025, and by failing to reimburse Dr. Qureshi for professional licensing fees timely submitted before the applicable annual reimbursement deadline.

121.    As a direct and proximate result of Defendant USF's material breaches of the Employment Agreement, Plaintiff suffered damages including withheld compensation and consequential damages resulting from USF's withholding of that compensation while Plaintiff was on medical leave without other income beginning April 9, 2025, in amounts to be determined at trial.

## <u>COUNT XI</u>
### *(Retaliation in Violation of the False Claims Act, 31 U.S.C. Section 3730(h) - Against Defendants USF and TGH)*

122.    Plaintiff incorporates by reference paragraphs 33 through 38, 39 through 48, 49 through 53, and 61 through 62 of this Complaint.

123.    No EEOC charge or administrative exhaustion is required as a prerequisite to suit under the False Claims Act, 31 U.S.C. Section 3730(h).

124.    The USF/Tampa General Hospital Center for Advanced Lung Disease and Lung Transplant Program is a federally certified transplant program that bills and receives reimbursement from federal healthcare programs, including Medicare and Medicaid. As such, it is subject to the Centers for Medicare and Medicaid Services ("CMS") Conditions of Participation and organ procurement and transplantation network reporting requirements

33

administered by the United Network for Organ Sharing ("UNOS") and the Organ Procurement and Transplantation Network ("OPTN").

125. Dr. Qureshi engaged in protected activity under the False Claims Act on multiple occasions, starting with a January 2024 formal complaint raising concerns about quality of care, regulatory compliance, and the conduct of transplant leadership, including concerns he reasonably believed implicated false or improper claims to the federal government in connection with Medicare and Medicaid reimbursement by a federally certified transplant program.

126. In retaliation for Plaintiff's protected activity, Defendants subjected Plaintiff to a series of adverse employment actions, including: convening an unreasonably hostile compulsory meeting on April 7, 2025; threatening Plaintiff with termination; dispatching law enforcement to his home while he was hospitalized; issuing a written admonishment while he was hospitalized; overriding his FMLA leave request and placing him on compulsory leave conditioned on a psychiatric evaluation; stopping his wages and manipulating his leave records; and ultimately constructively discharging him on February 28, 2026.

127. By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available under 31 U.S.C. Section 3730(h), including reinstatement to a position of seniority equivalent to the position he would have held but for the retaliation, or front pay in lieu thereof, two times the amount of back pay owed, interest on the back pay, and compensation for any special damages, including litigation costs and reasonable attorneys' fees.

## COUNT XII
*(Retaliation in Violation of the Florida Whistleblower Act, Fla. Stat. Section 448.102 - Against Defendant TGH Only)*

128.    Plaintiff incorporates by reference paragraphs 15 through 19, 33 through 53, and 62 of this Complaint.

129.    Defendant TGH is a private employer within the meaning of the Florida Whistleblower Act, Fla. Stat. Section 448.102. Dr. Qureshi engaged in protected activity under Fla. Stat. Section 448.102 by objecting to and reporting activities he reasonably believed violated applicable laws, rules, and regulations, including quality of care standards governing the transplant program, CMS Conditions of Participation for federally certified transplant centers, and organ procurement and transplantation network reporting requirements. Dr. Qureshi made these reports through USF's EthicsPoint compliance system beginning January 15, 2024, through direct written communications to USF and TGH leadership, through his April 3, 2025 patient safety text message to Dr. Herazo and Dr. Poojary-Hohman, and through his April 6, 2025 email to USF executive leadership.

130.    Defendant TGH, as a joint employer of Dr. Qureshi, retaliated against him for engaging in this protected activity through its employee Dr. Dhanireddy, who directly participated in the retaliatory conduct described in the factual background, including threatening Dr. Qureshi with termination at the April 7, 2025 meeting and participating in the sustained campaign of adverse actions that followed Dr. Qureshi's protected reports. TGH's joint exercise of supervisory authority over Dr. Qureshi within the jointly-operated Center makes it jointly liable for the retaliatory adverse actions taken against him.

35

131.    The retaliatory adverse actions taken against Plaintiff for his protected activity include, but are not limited to: the hostile compulsory meeting convened on April 7, 2025; threats of termination; dispatch of law enforcement to Plaintiff's home during his hospitalization; issuance of a written admonishment while he was hospitalized; and the sustained pattern of retaliatory conduct that culminated in Plaintiff's constructive discharge on February 28, 2026.

132.    By reason of Defendant TGH's retaliation, Plaintiff suffered harm including lost wages, lost benefits, emotional distress, reputational damage, and other damages, and is entitled to all remedies available under Fla. Stat. Section 448.102, including reinstatement or front pay in lieu thereof, lost wages and benefits, compensatory damages, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, it is respectfully requested that this Court grant Plaintiff judgment as follows:

A. On Count I, awarding Plaintiff compensatory damages and other appropriate relief against Defendants USF and TGH, including punitive damages against Defendant TGH only, in an amount to be determined at trial;

B. On Count II, awarding Plaintiff compensatory damages and other appropriate relief against Defendants USF and TGH, including punitive damages against Defendant TGH only, in an amount to be determined at trial;

C. On Count III, awarding Plaintiff compensatory damages and other appropriate relief against Defendants USF and TGH, in an amount to be determined at trial;

D. On Count IV, awarding Plaintiff compensatory damages and other appropriate relief against Defendants USF and TGH, including punitive damages against Defendant TGH only, in an amount to be determined at trial;

E. On Count V, awarding Plaintiff compensatory damages and other appropriate relief against Defendant TGH, including punitive damages, in an amount to be determined at trial;

F. On Count VI, awarding Plaintiff compensatory damages and other appropriate relief against Defendant TGH, including punitive damages, in an amount to be determined at trial;

G. On Count VII, awarding Plaintiff compensatory damages, lost wages, lost benefits, and all other relief available under the Family and Medical Leave Act against Defendants USF and TGH, in an amount to be determined at trial;

H. On Count VIII, awarding Plaintiff compensatory damages, lost wages, lost benefits, liquidated damages, and all other relief available under the Family and Medical Leave Act against Defendants USF and TGH, in an amount to be determined at trial;

I. On Count IX, awarding Plaintiff compensatory damages against Defendant TGH for breach of the Medical Directorship Agreement, including the full amount of unpaid compensation confirmed as owed, plus pre- and post-judgment interest, and all other relief available for breach of contract, in an amount to be determined at trial;

J. On Count X, awarding Plaintiff compensatory damages against Defendant USF for breach of the Employment Agreement, including the full amount of unpaid extra clinical shift compensation, uncompensated donor call obligations for the period of September 2023 through

April 7, 2025, and unreimbursed professional licensing fees, plus pre- and post-judgment interest and all other relief available for breach of contract, in an amount to be determined at trial;

K. On Count XI, awarding Plaintiff reinstatement or front pay in lieu thereof, two times the amount of back pay owed with interest, and compensation for all special damages including litigation costs and reasonable attorneys' fees, against Defendants USF and TGH, pursuant to 31 U.S.C. Section 3730(h), in an amount to be determined at trial;

L. On Count XII, awarding Plaintiff lost wages, reinstatement or front pay in lieu thereof, compensatory damages, and reasonable attorneys' fees and costs against Defendant TGH, pursuant to Fla. Stat. Section 448.102, in an amount to be determined at trial;

M. Directing Defendants to make Plaintiff whole for all earnings and benefits he would have received but for Defendants' discriminatory, retaliatory, and unlawful conduct, including back pay, front pay, and benefits;

N. Directing Defendants to pay Plaintiff compensatory damages for mental anguish, emotional distress, humiliation, and the physical injury resulting from Defendants' unlawful conduct;

O. Awarding Plaintiff pre- and post-judgment interest;

P. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees; and

Q. Such other and further relief as this Court deems equitable, proper, and just.

## **DEMAND FOR JURY TRIAL**

The Plaintiff herein demands a jury trial on and for all issues so triable

Dated: New York, New York
      June 1, 2026

                                            Respectfully submitted,

                                            GODDARD LAW PLLC
                                            *Attorneys for Plaintiff*

                                          By: *&#95;/s/ Megan S. Goddard&#95;*
                                          Megan S. Goddard, Esq.
                                          39 Broadway, Suite 1540
                                          New York, New York 10006
                                          Tel: (646) 964-1178
                                          Fax: (212) 208-2914
                                          Megan@goddardlawnyc.com